```
┌────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #: _____        │
│ DATE FILED: 10/28/2011          │
└────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                  :

      - against -                         :          **OPINION**

RICHARD PETERSON,                         :
a/k/a "Robert James,"                                   04 Cr. 752 (DC)
                                          :
           Defendant.
                                          :
GREGORY CREW,
           Claimant.               :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**          PREET BHARARA, Esq.
                          United States Attorney for the
                          Southern District of New York
                               By:  Anna E. Arreola, Esq.
                                    Assistant United States Attorney
                          One St. Andrew's Plaza
                          New York, New York  10007
                          Attorneys for United States of America

                          LAW OFFICES OF STEVEN L. KESSLER
                               By:  Steven L. Kessler, Esq.
                          122 East 42nd Street, Suite 606
                          New York, New York  10168
                          Attorneys for Claimant

**CHIN, Circuit Judge**

      On July 19, 2005, defendant Richard Peterson pled guilty to wire fraud and engaging in the business of insurance after having been convicted of a felony involving dishonesty or breach of trust.  See United States v. Peterson, No. 04 Cr. 752(DC), 2010 WL 2331990, at *1 (S.D.N.Y. June 9, 2010).  Nearly

five months later, on December 5, 2006, Peterson signed a Post-
Plea Sentencing Stipulation ("Sentencing Stipulation")
whereby he agreed to forfeit to the United States all of his
right, title, and interest in the property located at: (1) 763-
765 Clayton Street, San Francisco, California (the "San Francisco
Property"); and (2) Unit #14, Windsor Village, Grand Cayman
Islands, British West Indies (the "Grand Cayman Property").  Id.

On March 13, 2007, I sentenced Peterson to 120 months'
imprisonment and entered a Preliminary Order of Forfeiture/Final
Order of Forfeiture covering his interest in the San Francisco
and Grand Cayman Properties.  Id.  The government then sent
notice to all persons and entities with a purported interest in
any of the forfeited properties.  Id.  Gregory Crew, Peterson's
long-term domestic partner, filed a timely petition, pursuant to
21 U.S.C. § 853, asserting claims to both the San Francisco and
Grand Cayman Properties.

In October 2010, I held a two-day hearing to resolve
Crew's claims.  I reserved decision as to whether Crew held a
valid interest in either property.  For the reasons set forth
below, I conclude that Crew, who has lived in, maintained, and
helped improve the San Francisco Property since the early 1980s,
has a community property interest in the San Francisco Property,

- 2 -

but not in the Grand Cayman Property.   The following constitute my findings of fact and conclusions of law.

**FINDINGS OF FACT**

**A.   Crew's Relationship with Peterson**

Crew and Peterson lived together as a couple for more than two decades at the San Francisco Property.  (Tr. 10-11).[1] They also vacationed, both together and separately, at the Grand Cayman Property, a condominium owned by DH Consultants, a company controlled by Peterson.  (Tr. 68-72, 183-84).

Crew and Peterson met at a party in San Francisco in 1980.  (Tr. 10).  They began dating, and less than a year later Crew moved in with Peterson.  (Tr. 10-11).  At the time, Peterson was renting an apartment in the San Francisco Property, which has three residential units.  (Tr. 45, 169).  As Crew explained, the couple agreed two years later that "we would share in everything"

---

[1]     References are as follows: "Tr." to the transcript of the hearing conducted on October 25 and 26, 2010; "CX" and "GX" to claimant's and government's exhibits at the October 25-26, 2010 hearing; "Plea Tr." to the transcript of Peterson's plea allocution; "Sen. Tr." to the transcript of Peterson's sentencing; "POF" to this Court's Preliminary Order of Forfeiture/Final Order of Forfeiture of March 13, 2007; "Sentencing Stipulation" or "Stip." to Peterson's Post-Plea Sentencing Stipulation of December 5, 2006; "PSR" to the Presentence Report dated December 9, 2005; and "Indictment" to the grand jury indictment of Peterson issued on July 28, 2004.

and "[w]hat was his was mine and vice versa." (Tr. 19).  At the time, California did not allow same-sex couples to register their relationship and its laws did not change in this respect for more than two decades. See Cal. Fam. Code § 297.5(c).

Nonetheless, Crew and Peterson held themselves out as a committed couple all these years. (Tr. 12-14, 19, 32).  For example, in 1991, Crew's employer, American Airlines, first offered employees the opportunity to designate beneficiaries to their 401(k) retirement accounts and life insurance policies. (Tr. 262-63; CX 8).  Since 1991, Crew has listed Peterson as his beneficiary. (Tr. 262-63; CX 8).  In 1998, when American Airlines began offering employees with a same-sex partner the same family medical benefits available to employees with a spouse, Crew registered Peterson. (Tr. 34).  On the registration forms for these policies, Crew stated that his domestic partnership with Peterson began on May 1, 1981. (CX 8).

On January 1, 2005, the California Domestic Partners Rights and Responsibilities Act of 2003 went into effect.  The law provides same-sex couples who register their partnerships with "the same rights, protections, and benefits" as married couples. Cal. Fam. Code § 297.5(c).  Peterson and Crew registered as domestic partners with the State of California two months later. (CX 7).

- 4 -

**B.** **San Francisco Property**

In January 1982, Peterson purchased the San Francisco Property.[2]  (Tr. 46; CX 6).  Crew and Peterson continued to live together in their apartment, and rented out the other two units.  (Tr. 48-49).  Crew contributed to household expenses, including the portion of the mortgage not covered by the rental income, as well as phone bills, insurance, taxes, and utilities, though there were periods when these payments were sporadic because Crew's ability to contribute financially fluctuated.  (Tr. 13-14, 32, 48-49, 211, 259).[3]  While the exact amount is unclear, from the time he moved in until the early 2000s, Crew paid, after the rental income was applied, roughly 40 percent of the cost of home ownership.  (Tr. 205).

In addition, Crew was deeply involved in major renovations to the San Francisco Property.  In 1986, he arranged and oversaw the first of a series of renovations, which included repainting all three units, installing new carpets, and fixing

--------

[2]     Although Peterson testified that Crew contributed "a couple of thousand" to the $15,000 down payment he gave to the San Francisco Property's former owner (Tr. 50-51), Crew did not claim he did so (Tr. 20-22).  I find that Crew did not contribute to the down payment.

[3]     By 1986, the mortgage was paid off in its entirety.  (Tr. 52).

the kitchens and bathrooms.  (Tr. 150-52).  Five years later, Crew

supervised a second substantial renovation of the apartment in

which he and Peterson lived.  (Tr. 152).  This project involved

installing a new kitchen and bathrooms, purchasing and installing

new appliances, and knocking down and installing new walls.  (Tr.

152).  Crew contributed about $15,000 towards this work.  (Tr. 152-

53).  Two years later, Peterson took out a $400,000 home equity

loan, secured by the newly renovated San Francisco Property.  (Tr.

53).  Throughout the 1990s, some of the money that Crew contributed

to the household was used to help pay down this loan.  (Tr. 53-54).

From about March 2002 through at least October 2003, the

couple undertook a third renovation, this time fixing the two

rental units.  Crew again supervised the entire project.  (Tr. 60-

65).  He spent between $10,000 and $15,000 on the renovation.  (Tr.

154).  The total cost exceeded $150,000, with most of the funds

coming from proceeds of Peterson's criminal activities.  (Stip. 3

("[H]e used proceeds of his criminal acts . . . to pay  the

mortgage on, and renovate" the San Francisco Property.); CX 5

(copies of checks used to pay for the renovations); Tr. 60-65).

While Peterson contributed more in terms of money, Crew

made some financial contributions and was principally responsible

for the upkeep of the San Francisco Property.  (Tr. 52, 65, 151-

53).

## C.   **Grand Cayman Property**

In 1991, Peterson established a company called DH Consultants in the Grand Cayman Islands.  (Tr. 69).  Using Peterson's funds, DH Consultants then purchased the Grand Cayman Property for $325,000 that same year.  (Tr. 71).  The Property's associated fees, about $10,000 per year, were mostly paid with the proceeds of long-term rentals, though Crew apparently paid certain fees in 2002 and 2003, as well as the utilities during some of his visits.  (Tr. 71-72).  Peterson and Crew did not spend much else on the Grand Cayman Property.  (Tr. 72).

## D.   **Property Transfers**

In late 2002, Crew was hospitalized for three weeks with life-threatening complications from a long-term illness. (Tr. 74).  His poor health condition caused Crew and Peterson to plan for Crew's well-being in the event of Peterson's death.[4] (Tr. 158).  In December 2002, Peterson instructed his representative in the Cayman Islands to transfer ownership of the condominium to Crew.  (Tr. 70).  The transfer was executed that same month.  (CX 1).

---

[4]     Whether Peterson transferred property due to concerns about taxation and estate planning, or whether he was attempting to shield these assets from creditors, is ultimately not relevant to the issues before this Court.

- 7 -

Although Crew knew the Grand Cayman Property was owned by a corporation, he never questioned why he received it. (Tr. 185, 187). He did acknowledge that he suspected that Peterson had "influenced" the transfer. (Tr. 185). And while the transfer deed states that $355,000 was given for the Grand Cayman Property, as Crew and Peterson both acknowledge, Crew paid nothing. (Tr. 72, 185).

In October 2003, a grand jury sitting in the Southern District of New York subpoenaed Peterson for documents relating to fraudulent insurance policies he issued from 2000 through 2003. (PSR ¶ 32). That same month, Peterson executed a quitclaim deed transferring title of the San Francisco Property to Crew in exchange for $100 in cash. (CX 2). The transfer was, according to Crew, part of a plan to avoid inheritance taxes that he would owe upon Peterson's death. (Tr. 157). After the transfer, the City of San Francisco re-assessed the property, increasing its value from $239,260 to $1,530,000. (CX 11). The annual property tax subsequently rose from $3,000 to $20,000. Crew unsuccessfully challenged the increase. (Tr. 166-67).

In early 2004, Crew and Peterson resumed renting the two newly-renovated units, charging more than double the prior rent. (Tr. 65). Rent was paid directly to Crew, who deposited

- 8 -

the funds into his personal checking account.  (Tr. 159).

Beginning in May 2004, Crew made the home equity loan payments on

the San Francisco Property from this account.  (Tr. 159-61; CX

17).  Crew still lives in the San Francisco Property, collects

rent from the tenants, and pays the mortgage.  (Tr. 10, 65, 159-

61).

<u>**DISCUSSION AND CONCLUSIONS OF LAW**</u>

**A.    <u>General Forfeiture Principles</u>**

          The United States may seek forfeiture of "any property

constituting or derived from proceeds obtained directly and

indirectly" as a result of a fraud offense.  18 U.S.C.

§ 982(a)(2)(A).  Such forfeitures are governed by 21 U.S.C. § 853

and Federal Rule of Criminal Procedure 32.2, and they are

elements of the defendant's sentence, rather than elements of the

underlying crime.  <u>Libretti v. United States</u>, 516 U.S. 29, 38

(1995); <u>see</u> 18 U.S.C. § 982(b)(1); Fed. R. Crim. P. 32.2.  This

means that, at the forfeiture phase of the trial, the government

need only establish its right to forfeiture by a preponderance of

the evidence, the standard applicable at sentencing.  <u>See</u> <u>Willis</u>

<u>Mgmt, Ltd., v. United States</u>, 652 F.3d 236, 241 (2d Cir. 2011).

To determine if the government has satisfied its burden, the

court may consider the record, any written plea agreements or

- 9 -

stipulations, and any additional information submitted by the parties and accepted by the court as relevant and reliable.  See Fed. R. Crim. P. 32.2(b)(1)(B); Libretti, 516 U.S. at 43 (observing stipulation of facts and defendant's agreement to forfeit could satisfy government's burden).

On March 13, 2007, pursuant to 18 U.S.C. § 982(a)(2)(A), I entered a Preliminary Order of Forfeiture/Final Order of Forfeiture for the San Francisco and Grand Cayman Properties as "property constituting or derived from proceeds obtained directly and indirectly" as a result of fraud offenses. (POF 1).  In light of Peterson's Sentencing Stipulation and the substantial evidence in the record, I found that the government established its right to forfeiture under a preponderance of the evidence.  (POF 2-4).

After the court enters a forfeiture order based on a criminal conviction, third parties may petition the court to adjudicate their interests in the property subject to forfeiture and to amend the forfeiture order.  21 U.S.C. § 853(k), (n); see Pacheco v. Serendensky, 393 F.3d 348, 351-52 (2d Cir. 2004). "This proceeding does not involve relitigation of the forfeitability of the property; its only purpose is to determine whether any third party has a legal interest in the forfeited

property."  Fed. R. Crim. P. 32.2, Advisory Committee Note (b)

(2000); see also United States v. Andrews, 530 F.3d 1232, 1236-37

(10th Cir. 2008); United States v. Porchay, 533 F.3d 704, 710

(8th Cir. 2008).

To prevail under § 853(n), a third party must

establish, by a preponderance of the evidence, or, with respect

to a "Marvin claim," as discussed below, by clear and convincing

evidence, that either: (1) he is a bona fide purchaser for value

of the properties, 21 U.S.C. § 853(n)(6)(B); or (2) he has a

legal interest in the properties that "renders the order of

forfeiture invalid in whole or in part because the right, title,

or interested was vested in [him] rather than the defendant or

was superior to any right, title, or interest of the defendant at

the time of the commission of the acts" giving rise to the

forfeiture, 21 U.S.C. § 853(n)(6)(A).

Pursuant to 21 U.S.C. § 853(n)(6)(A), Crew argues that

the forfeiture order is invalid in whole, or in part, as to both

properties, because: (1) both properties were transferred to him

before any government interest vested; (2) the registration of

Crew and Peterson's domestic partnership in the State of

California created a community property interest superior to the

government's interest; and (3) under Marvin v. Marvin, 557 P.2d

- 11 -

106 (Cal. 1976), Crew's nearly thirty-year partnership with

Peterson established a community property interest by implied

contract that is not subject to forfeiture.  Crew's assertions of

ownership and interest in the properties are governed by

California law.  See United States v. Hooper, 229 F.3d 818, 820

(9th Cir. 2000) ("State law determines whether Claimants have a

property interest, but federal law determines whether or not that

interest can be forfeited.").  I address each of these claims in

turn.

B.      **The Claims**

        1.      **Property Transfers**

                a.      **Applicable Law**

                A property may not be forfeited when it has been

validly transferred to a third party.  United States v.

Schwimmer, 968 F.2d 1570, 1580 (2d Cir. 1992) (applying 18 U.S.C.

§ 1963).  Under California law, however, a court may void

fraudulent conveyances and constructive fraudulent conveyances.

Cal. Civ. Code § 3439.04(a)(2)(B) (effective Jan. 1, 2005).

Voidable conveyances are those made with the intent to delay or

defraud creditors, or without receipt of equivalent value when

the transferor "[i]ntended to incur, or believed or reasonably

should have believed that he . . . would incur, debts beyond his

. . . ability to pay as they became due." Cal. Civ. Code
§ 3439.04(a)(2)(B). Pleading guilty to a fraudulent scheme is
"sufficient to establish the actual intent to hinder, delay, or
defraud creditors," and thereby provides a basis for a court to
determine that a related transfer is a fraudulent conveyance. In
re Slatkin, 525 F.3d 805, 814 (9th Cir. 2008).

  **b. Application**

  Peterson's fraudulent activities giving rise to the
forfeitures began in 2000 and he pled guilty on July 19, 2005.
(Stip. 1; Indictment 2, 5-6). In December 2002 and October 2003,
respectively, Peterson transferred the Grand Cayman and San
Francisco Properties to Crew. (CX 1-2). Peterson's guilty plea
establishes the actual intent required by California law, thus
voiding both transfers as fraudulent conveyances and rendering
them forfeitable.

  Even assuming that actual intent to defraud was not
established, Peterson transferred both properties for well below
their actual value: $100 in cash for the San Francisco Property
and nothing for the Grand Cayman Property. This was during a
period when his criminal activities were beginning to unravel,
and when he "[i]ntended to incur, or . . . reasonably should have
believed that he . . . would incur, debts beyond his . . .

ability to pay as they became due." Cal. Civ. Code
§ 3439.04(a)(2)(B). Regardless of whether Peterson and Crew
actually believed they were engaged in some ill-advised tax
planning, a claim which I reject, both transfers are void as
fraudulent or constructively fraudulent conveyances.

Accordingly, Crew, who is no longer arguing that he is
a bona fide purchaser (Tr. 5-6), did not acquire a sufficient
interest to defeat the forfeiture by virtue of the transfers.
See Nicolos v. Grover, 231 Cal. Rptr. 79, 81 (Cal. Ct. App. 1986)
("The general rule is that, as against a grantor's creditors, a
fraudulent conveyance is void and leaves title in the grantor as
though no conveyance has been attempted."); see also Hooper, 229
F.3d at 823 ("The rights of such transferees who are not bona
fide purchasers are expressly subject to forfeiture under §§
853(c) and 853(n)(6).").

### 2. **Registration of the Domestic Partnership**

As the transfers were not valid, I turn to Crew's next
claim -- that the registration of his domestic partnership with
Peterson partially invalidated the forfeiture order because it
occurred before Peterson pled guilty, thereby creating an
interest superior to the government's interest. To resolve this
issue, this Court must determine: (1) whether the properties in

- 14 -

question constitute offense property or substitute property under
21 U.S.C. § 853; and (2) when the government's interest in
substitute and offense property vests.

### a.   Offense and Substitute Property

#### i.   Applicable Law

Forfeitable property is divided into two categories
under 21 U.S.C. § 853: offense property and substitute property.
21 U.S.C. § 853(a)(1), (p).  Offense property is "any property
constituting, or derived from, any proceeds the person obtained,
directly or indirectly," as the result of the crime.  21 U.S.C.
§ 853(a)(1); see 18 U.S.C. § 982(a)(1).  Substitute property
includes assets that have been transferred to a third party or
dissipated or otherwise cannot be located.  21 U.S.C. § 853(p).
Additionally, as the Second Circuit has held that § 853 allows
for partial forfeitures, part of a property or asset can
constitute offense or substitute property.  See Pacheco, 393 F.3d
at 355 (discussing constitutional concerns of not allowing
partial forfeitures).

#### ii.   Application

The record, including the Sentencing Stipulation,
demonstrates that equity in both the San Francisco Property and

the Grand Cayman Property constitutes both offense and substitute property.  Peterson stipulated that "he used proceeds from his criminal acts . . . to pay the mortgage, and renovate" the San Francisco Property.  (Stip. 3).  As for the Grand Cayman Property, Peterson admitted he invested a portion of the fraudulent proceeds "to pay for the upkeep" of the Grand Cayman Property, though the exact amount was not set forth in the stipulation or addressed at the hearing.  (Stip. 3).  Peterson agreed to forfeit any offense property interest in the San Francisco and Grand Cayman Properties retroactive to this time.  (POF 1; Stip. 4; Indictment 2).  Accordingly, equity in both properties equivalent to the proceeds of Peterson's criminal acts invested in them is properly forfeited as offense property.  See 21 U.S.C. § 853(a)(1).  (POF 1).

The remaining equity in both properties constitutes substitute assets.  In his stipulation, Peterson "agreed to forfeit all right, title and interest" in these substitute assets.  (Stip. 4; see POF 2).  These remaining assets are forfeitable to the extent that they were "property of the defendant" on the date that the government's interest in them vested.  28 U.S.C. § 853(p)(2); Fed. R. Crim. P. 32.2(c)(2).

- 16 -

b.   **Vesting Time of Government Interests**

i.   **Applicable Law**

Government interests in forfeitable property vest at different times, depending on the property's categorization.  See 21 U.S.C. § 853(c), (n)(2); United States v. Parrett, 530 F.3d 422, 430 (6th Cir. 2008).  For offense property, the government's interest vests retroactively to the date of the original criminal act.  See 21 U.S.C. § 853(c).  In contrast, the "statutory provision regarding substitute assets does not explicitly provide for relation back." Parrett, 530 F.3d at 430; see 21 U.S.C. § 853(n)(2).

The Second Circuit has not ruled on when the government's interest in substitute assets, pursuant to 28 U.S.C. § 853, vests.  Other "circuits are split as to whether the government's interest in substitute property relates back to the date of the act giving rise to the forfeiture," or whether vesting occurs only upon conviction because until then the government has only a "potential and speculative future interest." Parrett, 530 F.3d at 430 (comparing Fourth and Tenth Circuit decisions).

Two district courts in this Circuit agree that the government's interest in substitute assets does not vest on the

- 17 -

date of the underlying offense; these district courts, however,
disagree on when such interests do vest.[5]   In United States v.
Salvangno, a case involving the RICO forfeiture statute, 18
U.S.C. § 1963, the district court held that the government does
not have superior rights to substitute assets until an order of
forfeiture is granted.  No. 5:02 Cr. 051 (LEK/RFT), 2006 WL
2546477, at *19 (N.D.N.Y. Aug 28, 2006), aff'd on other grounds,
343 F. App'x 702 (2d Cir. 2009).  In contrast, in United States
v. Kramer, the district court held that the government's interest
in substitute assets does not vest until the defendant is
convicted.  No. 1:06 Cr. 200 (ENV/CLP), 2006 WL 3545026, at *6-8
(E.D.N.Y. Dec. 8, 2006).

Allowing a defendant, notified by an indictment that
his property is subject to forfeiture, to dissipate these assets
before conviction would undermine the very purpose of the

---

[5]    Both district courts relied on the reasoning in United
States v. Gotti, where the Second Circuit, interpreting similar
language in the RICO forfeiture statute, 18 U.S.C. § 1963, held
that the law did not provide for pre-trial restraint of
substitute assets.  155 F.3d 144, 149-50 (2d Cir. 1998).  Other
courts considering similar questions of when the government's
interest in substitute assets vests often cite decisions relating
to both statutes.  See United States v. Miller, 26 F. Supp. 2d
415, 432 (N.D.N.Y. 1998) ("[T]he RICO forfeiture provision and
the § 853 forfeiture statute are so similar in both legislative
history and statutory language as to warrant similar
interpretation.").

statute.  See United States v. Monsanto, 491 U.S. 600, 613 (1989)

("Whatever discretion Congress gave the district courts . . .

that discretion must be cabined by the purposes for which

Congress created it: to preserve the availability of property

. . . for forfeiture.") (interpreting 21 U.S.C. § 853(c), (e));

In re Assets of Billman, 915 F.2d 916, 921 (4th Cir. 1990)

(holding that RICO forfeiture statute does not "permit a

defendant to thwart the operation of forfeiture laws by

absconding with RICO proceeds and then transferring his

substitute assets to a third person who does not qualify as a

bona fide purchaser for value"); United States v. Norton, No.

2:99 Cr. 10078, 2002 WL 31039138, at *4 n.7 (W.D. Va. Sept. 3,

2002) ("[I]t is not unfair for [substitute assets under 21 U.S.C.

§ 853(p)] to relate back to the date of public notice of the

government's intent to obtain forfeiture.").

      In fact, even while holding that the pretrial restraint

of substitute assets under a RICO forfeiture statute was

improper, which is not the issue here, the Second Circuit, in

Gotti, acknowledged that such restraint "might arguably serve the

stated legislative purpose of preserving assets for forfeiture

upon conviction."  155 F.3d at 150.  To give full force to the

criminal forfeiture statute, I conclude that the government's

interest in substitute assets vests upon the issuance of the
grand jury indictment.

### ii.  Application

Peterson was indicted on July 28, 2004; he pled guilty
on July 19, 2005.  (Indictment 1; Stip. 1-7).  Crew and Peterson
registered their domestic partnership with the State of
California on March 1, 2005.  (CX 7).  Under California's
Domestic Partnership Act, however, rights are not granted
retroactively to previously existing partnerships unless they
were registered before January 1, 2005.  See Velez v. Smith, 48
Cal. Rptr. 3d 642, 653-59 (Cal. Ct. App. 2006).  I find that the
registration of Crew and Peterson's domestic partnership was
grounded in genuine affection, and not merely an effort to
transfer property subject to forfeiture.  The registration,
however, occurred after Peterson was indicted and does not
provide Crew with a legal interest that can prevent forfeiture of
either property.

### 3.  Agreement Establishing a Community Property Interest

Lastly, Crew argues that his long-term partnership with
Peterson established a community property interest in the San
Francisco and Grand Cayman Properties by implied contract, and
that this interest is not subject to forfeiture.  For the reasons

set forth below, and under the California Supreme Court case of
Marvin v. Marvin, 557 P.2d 106 (Cal. 1976), I conclude that Crew
properly asserts such an interest in the San Francisco Property,
but not in the Grand Cayman Property.

        a.    **Applicable Law**

The California Supreme Court in Marvin upheld an
unmarried couple's right to contract for "property acquired
during the relationship" as it saw fit, including exchanging a
community property right for domestic services.  Id. at 116.  The
court did so after finding that the parties had "entered into an
oral agreement that while [they] lived together they would
combine their efforts and earnings and would share equally any
and all property accumulated as a result of their efforts whether
individual or combined."  Id. at 100 (internal quotations marks
omitted).

These so-called "Marvin claims" often rest on oral or
implied contracts, including those where "[t]he parties never
bothered to actually spell out the terms of their agreement or
the consideration therefor."  Alderson v. Alderson, 225 Cal.
Rptr. 610, 616 (Cal. Ct. App. 1986).  These claims routinely
withstand challenges under California's Statute of Frauds, as
courts employ equitable estoppel based on the same consideration

underlying the implied agreement. Cal. Civ. Code § 1624(a); <u>see</u> <u>Byrne v. Laura</u>, 60 Cal. Rptr. 2d 908, 917 (Cal. Ct. App. 1997) (employing equitable estoppel to find <u>Marvin</u> claimant had seriously changed her position "by moving in with him, performing the duties of a spouse, and retiring from her job," the very consideration that had supported the claim itself).

<u>Marvin</u> does not create a community property interest in all property held by either party; rather, <u>Marvin</u> allows the parties to contract for individual property as they see fit. <u>Marvin</u>, 557 P.2d at 116 n.10. Because <u>Marvin</u> claims are rooted in contract, not family law, the parties must demonstrate an intent to agree and an exchange of consideration. This consideration can consist of financial contribution or more abstract services. <u>See</u> <u>Alderson</u>, 225 Cal. Rptr. 2d at 616 (upholding <u>Marvin</u> claim where the consideration consisted of doing "whatever a wife does"); <u>Della Zoppa v. Della Zoppa</u>, 103 Cal. Rptr. 2d 901, 913 (Cal. Ct. App. 2001) (upholding a <u>Marvin</u> claim based on consideration of "preparing meals, managing the home generally, arranging for remodeling, including arranging for new carpeting, furniture, artwork and appliances in, and painting of, the home").

Because Marvin claims are challenges to legal title,
they must be proven by clear and convincing evidence.  Cal. Evid.
Code § 662 ("The owner of the legal title to property is presumed
to be the owner of the full beneficial title.  This presumption
may be rebutted only by clear and convincing proof."); Tannehill
v. Finch, 232 Cal. Rptr. 749, 751 (Cal. Ct. App. 1986) (holding
that a Marvin claimant "was required to establish her claim by
clear and convincing evidence.").  A proper Marvin claim, which
covers same-sex couples, see Whorton v. Dillingham, 248 Cal.
Rptr. 405, 409-10 (Cal. Ct. App. 1988), thus requires clear and
convincing evidence that: (1) the parties intended to contract
for a shared interest in the property; and (2) adequate
consideration was provided for the interest.

### b. Application

#### i. San Francisco Property

Crew and Peterson lived in the San Francisco Property
for more than two decades, beginning in the spring of 1981.  (Tr.
11).  They held themselves out as, and in fact were, a couple all
those years.  As soon as they had the opportunity, they
registered as domestic partners with Crew's employer, and later
with the State of California.  (Tr. 34, 262-63; CX 7-8).  From
1981 forward, Crew and Peterson treated the San Francisco

Property as their shared residence. They promised each other that "[w]hat was his was mine and vice versa," thus demonstrating an intent to own the home jointly. (Tr. 19). See Chiba v. Greenwald, 67 Cal. Rptr. 3d 86, 92 (Cal. Ct. App. 2007) ("They allegedly agreed to live together, cohabitate and combine their efforts and earnings, share equally any and all property accumulated as a result of their efforts whether individual or combined, and hold themselves out to the public as husband and wife.") (internal quotation marks omitted).

As consideration for this shared interest, Crew provided some financial contribution. (Tr. 205). While he never paid as much as Peterson, equal payments are not required for a Marvin claim. See Chiba, 67 Cal. Rptr. 3d at 92 ("The promise to perform these domestic services is lawful and adequate consideration" for a Marvin claim.); Alderson, 225 Cal. Rptr. at 616-17; Della Zoppa, 103 Cal. Rptr. 2d at 913. Crew oversaw three extensive renovations to the San Francisco Property, including one that resulted in a substantial increase in the rent the couple charged for the units. Moreover, Crew's non-financial contributions to the upkeep of the home exceeded those made by Peterson. The services Crew provided, combined with his financial contributions and the promises Crew and Peterson made to each other, establish a community property interest under Marvin. See id.

- 24 -

ii. **Grand Cayman Property**

In contrast, Crew fails to demonstrate that he and Peterson had an intent to establish a community property interest in the Grand Cayman Property. The fact that Peterson created a company, DH Consultants, to vest title suggests he did not intend for the condominium to be shared property. At the hearing, Crew acknowledged he took little to no interest in the ownership of the Grand Cayman Property. Tellingly, he admitted he did not know what DH Consultants was, or why the condominium was transferred to him. Crew even conceded that he did not even ask Peterson about the transfer, although he "had a sense that maybe he influenced it in some way." (Tr. 185).[6]

Whether or not Crew's very limited investment in the Grand Cayman Property could have served as adequate consideration for a <u>Marvin</u> claim is irrelevant where, as here, there is no clear intent to share the property. In addition, contrary to

---

[6]     In Peterson's Sentencing Stipulation, Peterson agreed not to assist any third party with any claim to any property named in the forfeiture order, other than Crew's claim in the San Francisco Property. While I assume without deciding that Peterson did not violate this agreement by testifying at this hearing, the agreement demonstrates that his understanding as to the ownership of the Grand Cayman condominium differed from his understanding as to the ownership of the San Francisco Property. (Stip. 4).

Crew's argument, any personal or community property interest in the Grand Cayman Property is not protected by a Homestead Exemption.  See United States v. Lot 5, Fox Grove, 23 F.3d 359, 363 (11th Cir. 1994); United States v. Curtis, 965 F.2d 610, 616 (8th Cir. 1992).

### iii.  Size of Crew's Community Property Interest in the San Francisco Property

As Peterson's partner for nearly thirty years, Crew properly asserts a community property interest in the San Francisco Property under Marvin.  Crew's interest vested before the fraudulent activities at issue began.

Peterson invested $156,857.04 in fraudulent proceeds to renovate the San Francisco Property, largely during a period in which his criminal activity was unraveling.  This investment resulted in a doubling of the rent that Crew now collects.  (See Stip. 3 (Peterson "used proceeds of his criminal acts . . . to pay the mortgage on, and renovate" the San Francisco Property); Tr. 61-62 ("Q: Are you referring now to the 2002 renovations on the property?  A: Yes. . . .  Q: And did you cause [CAS Construction Company] to be paid?  A: Yes.  Q: Okay.  And how did you pay them?  A: I paid them with a check from URS."); GX 19 (copies of checks from United Restaurant Services ("URS") to CAS

Construction Company for renovations to the San Francisco Property from March 2002 through at least October 2003)). These funds are thus forfeited as offense property because they "constitut[e], or [are] derived from" Peterson's criminal activities. 21 U.S.C. § 853(a)(1).

After Peterson's investment of $156,857.04 is deducted as fraudulent proceeds, Crew is left with a community property interest in the remaining equity in the San Francisco Property, but no such interest in the Grand Cayman Property.[7] See Pacheco, 393 F.3d at 355 ("[W]e agree with those courts that have suggested that the criminal forfeiture statute, 21 U.S.C. § 853, permits partial forfeiture of real property.").

---

[7]    The Lester decision, in which the Ninth Circuit held that 21 U.S.C. § 853(p) does not extend to the community property interest of an innocent spouse in substitute property, is not controlling. 85 F.3d at 1413-15. That case is factually different in that the community property at issue there was not, as here, directly linked to the criminal activity of one spouse. Id. at 1411. In fact, the Lester court explicitly noted that "this case does not involve the forfeiture of community property which is directly or indirectly linked to the criminal activity of the guilty spouse." Id. at 1411 n.10. Here, in contrast, the San Francisco Property was greatly improved by Peterson's direct investment of at least $156,857.04 in fraudulent proceeds, an investment which continues to benefit Crew financially in increased rent. (Tr. 65). To hold otherwise, would unjustly enrich the couple for investments Peterson made while his criminal activity was unraveling. And this deduction, in no way, divests Crew of his "legitimate interest" in the San Francisco Property.

- 27 -

## CONCLUSION

For the reasons set forth above, the forfeiture order is adjusted to account for Crew's community property interest in the San Francisco Property.  After the $156,857.04 in fraudulent proceeds that Peterson invested in renovations to the San Francisco Property is deducted, Crew is entitled to a one-half interest in the remaining equity in the property, but no interest in the Grand Cayman Property.  The government shall submit a final order of forfeiture on notice forthwith.

SO ORDERED.

Dated:      New York, New York
            October 28, 2011

DENNY CHIN
United States Circuit Judge
Sitting by Designation

- 28 -